STUDENT BAR ASSOCIATION BOARD OF GOVERNORS, OF THE SCHOOL OF LAW, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; CAROLYN McALLASTER; CATHERINE REID; LAURA BANKS; JOHN MEUSER; ANN WALL; AND PAUL MONES v. ROBERT BYRD, DEAN OF THE UNIVERSITY OF NORTH CAROLINA SCHOOL OF LAW AT CHAPEL HILL, IN HIS OFFICIAL CAPACITY; FEREBEE TAYLOR, CHANCELLOR OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, IN HIS OFFICIAL CAPACITY; WILLIAM L. FRIDAY, PRESIDENT OF THE UNIVERSITY OF NORTH CAROLINA, IN HIS OFFICIAL CAPACITY; WALTER R. DAVIS, CHAIRMAN, BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, IN HIS OFFICIAL CAPACITY; WILLIAM A. DEES, JR., CHAIRMAN OF THE BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA, IN HIS OFFICIAL CAPACITY; AND THE UNIVERSITY OF NORTH CAROLINA

No. 7515SC668

(Filed 16 March 1977)

State § 1.5—open meetings law — meetings of U.N.C. Law School faculty

Since the faculty of the School of Law of the University of North Carolina is a State funded committee or group which has been delegated the authority not only to deliberate but also to conduct the "people's business" related to the operation of the law school, the official meetings of the faculty are required by G.S. 143-318.2 to be open to the public.

Judge HEDRICK dissents.

APPEAL by defendants from Preston, Judge. Judgment entered 18 June 1976 in Superior Court, ORANGE County. Heard in the Court of Appeals 19 January 1977.

On 6 April 1976, plaintiffs filed a verified complaint seeking to enjoin defendants from allowing the official meetings of the Faculty of the School of Law of the University of North Carolina to be closed to members of the public.

A hearing on plaintiffs' motion for a prehearing injunction was apparently conducted on 30 April 1976. The court issued a preliminary injunction on 4 June 1976.

Defendants failed to answer or other responsive pleadings in denial of any of the allegations of the complaint.

On 18 June 1976, the judge, after reciting that he had been advised that none of the parties had anything further to offer relative to the case, entered judgment making the injunction permanent.

*Loflin & Loflin, by Thomas F. Loflin III and Carolyn Mc-Allaster, for plaintiff appellees.*

*Attorney General Edmisten, by Senior Deputy Attorney General Andrew A. Vanore, Jr., for defendant appellants.*

VAUGHN, Judge.

Defendants have failed to deny any of the allegations of the complaint. "Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damages, are admitted when not denied in a responsive pleading." Rule 8(d) N.C. Rules of Civil Procedure. Those rules provide that there *"shall* be a complaint and an *answer."* Rule 7, *supra.*

Defendants have not taken exceptions to any of the court's findings of fact and neither requested that other facts be found nor excepted to the court's failure to find additional facts. Consequently, none of the evidence is brought forward.

We are called upon, therefore, to decide the case on the basis of plaintiffs' complaint and the judgment.

The General Assembly has declared it to be the public policy of this State that hearings, deliberations and actions of the commissions, committees, boards, councils and other governing and governmental bodies, which administer the legislative and executive functions of the State and its political subdivisions, shall be conducted openly. G.S. 143-318.1.

This policy is further implemented by the following legislative mandate:

"All official meetings open to the public.—All official meetings of the governing and governmental bodies of this State and its political subdivisions, including all State, county, city and municipal commissions, committees, boards, authorities, and councils and any subdivision, subcommittee, or other subsidiary or component part thereof which have or claim authority to conduct hearings, deliberate or act as bodies politic and in the public interest shall be open to the public. And every meeting, assembly, or gathering together at any time or place of a majority of the members of such governing or governmental body for the purpose of conducting hearings, participating in deliberations or voting upon or otherwise transacting the public

business within the jurisdiction, real or apparent, of said body shall constitute an official meeting, but any social meeting or other informal assembly or gathering together of the members of any such body shall not constitute an official meeting unless called or held to evade the spirit and purposes of this Article." G.S. 143-318.2.

Certain agencies or groups are expressly exempted from the operation of the act. G.S. 143-318.4. Other agencies or groups, though not expressly exempted from the act, are permitted to conduct closed sessions for particular purposes. For example, the act provides:

" . . . Nor shall this Article be construed to prevent any board of education or governing body of any public educational institution, or any committee or officer thereof, from hearing, considering and deciding disciplinary cases involving students in closed sessions." G.S. 143-318.3(b).

The organizational structure of the University of North Carolina is set out in Article 1 of Chapter 116 of the General Statutes. That chapter creates a Board of Governors with the responsibility for, among other things, "the general determination, control, supervision, management and governance" of all of the affairs of the 16 constituent institutions of the University. G.S. 116-11(2). The Board is specifically required to determine the functions, educational activities and academic programs of the University. G.S. 116-11(3). It is specifically required to set enrollment levels. G.S. 116-11(8). The Board is given the authority to delegate any part of its authority over the affairs of any institution to the Board of Trustees of a constituent institution or, through the President of the University, to the Chancellors of the institutions. G.S. 116-11(13). The Board must appoint a President who is authorized to appoint such advisory committees as deemed necessary. G.S. 116-14.

Each of the constituent institutions of the University is served by a Board of Trustees that acts as advisor to the Board of Governors and to the Chancellor of each of the institutions. Each Board of Trustees has such powers as it may be delegated by the Board of Governors. G.S. 116-33. The Chancellor of each institution, subject to the policies prescribed by the Board of Governors and the Board of Trustees, makes recommendations for the appointment of personnel and development of educational programs for that institution. The Chancellor is the administra-

tive head of the institution and exercises complete executive authority therein and is subject to the direction of the President. He is responsible for carrying out policies of the Board of Governors and Board of Trustees. It is his duty to keep the President, and through him, the Board of Governors fully informed concerning the operation of the institution. G.S. 116-34.

The parties stipulated that all parties were properly before the court. Fourteen of the allegations of the complaint relate to the identification of those parties.

All factual matters alleged in the complaint must be taken as true. Plaintiffs allege that it is the policy of defendants to bar members of the public from official meetings of the Faculty of the School of Law of the University of North Carolina at Chapel Hill. Plaintiffs, members of the general public, have been refused admission to those meetings. If, therefore, official meetings of that body fall within the meaning of G.S. 143-318.2, the judgment must be affirmed.

Plaintiffs alleged "The Law School Faculty of the University of North Carolina at Chapel Hill School of Law, represented by Defendant Byrd, is the governing body of the said school of law and has lawful authority to act as a body politic and in the public interest."

Consideration of the organizational structure of the University, to which we have referred, discloses that the Board of Governors has been designated by the General Assembly as the ultimate governing body of the University and any constituent institution or division thereof. The Board, however, has the power, express and implied, to delegate its governing powers. On this question defendants, in their brief, make a passing reference to something they call "THE CODE of the Board of Governors." Such a document appears to have been introduced in the trial court. Defendants, however, did not elect to make it, in whole or in part, a part of the record for our consideration. Whether the Board has delegated any of its governing powers in a particular instance, is a question of fact. Defendants, by their failure to answer the quoted paragraph of the complaint appears to admit that the Law School Faculty does, in fact, govern the Law School.

Defendants except to none of the facts found by the court. They did not request the court to find other facts that could

perhaps have shed more light on the facts so found. Among other things, the court, based in part on the testimony of defendant Byrd, found:

"(A) The law school faculty, pursuant to a recommendation . . . [sic] the admissions policy committee, makes the *final decision* with regard to the enrollment level of the law school by voting annually on the specific number of in-coming first-year students to be admitted the next fall. This decision *is not submitted to any higher authority within the University for approval.*

(B) The law school faculty, *solely, approved* an *admissions formula* or 'predicated index' required to be met by a student seeking enrollment based on the applicant's undergraduate grade point average and LSAT score. The law faculty also approved the so-called 'wild card system' under which Dean Byrd controls a certain number of discretionary admissions to the first-year class. These admissions decisions were based on recommendation made to the law faculty by its Admission Policy Committee.

(C) The law faculty votes on the curriculum; in particular, the faculty approved at least five new courses in the past two years. *The curriculum decisions are not subject to ratification* by any higher authority in the University.

(D) The law school faculty voted to establish a system whereby each first year student would be enrolled in one small section. The research and writing component of the first year curriculum was also to be taught in this small section. This decision was *not subject to ratification by any higher authority* within the University.

(E) The law faculty sets the general *rules relating to re-admissions* of students to the law school who have become academically ineligible to continue in the school of law. The individual re-admission decisions are made by the faculty re-admission committee. These rules and decisions are *not submitted to any higher university* official for approval.

(F) The law faculty approves the editorial board of the *North Carolina Law Review,* as well as the eligibility

criteria for the *Law Review* Staff. This approval is not sub-
ject to review by any higher authority within the university.

(G) The Defendant Byrd, *pursuant to a recommenda-
tion by the law faculty, recommends persons to receive
initial employment* contracts to teach at the School of Law.
These faculty recommendations go through higher univer-
sity channels for approval to the Board of Trustees and
sometimes to the Board of Governors. *No one* that the law
school dean has *recommended* for initial employment on the
Law School Faculty *has ever been rejected* by these higher
university boards since the witness Byrd has been on the
law faculty beginning in 1963.

(H) The law *faculty approves* the prospective grad-
uates for graduation from the School of Law in terms of
their academic qualifications. This list is then submitted
to the Registrar's office of the University. *No student* that
the law *faculty approved* academically *has,* since 1963 when
Defendant Byrd joined the law faculty, *been rejected* by
the Registrar for reasons of academics." (Emphasis added.)

The act we consider is broad in its scope. Official meetings
of "all State ... commissions, committees, boards, authorities and
councils and *any* subdivision, subcommittee or other *subsidiary*
or *component part* thereof which have *or claim to have* authority
to conduct hearings, *deliberate* **or** act as bodies politic and in
the public interest ... " (Emphasis added) are covered. The
General Assembly, it appears, attempted to draft that section.
G.S. 143-318.2 in such terms that it would cover (with a few
specific exceptions) *every* meeting where *the business of the
people* may be conducted. We note the broad language of that
section and compare it with the narrow list of agencies ex-
empted from the act by G.S. 143-318.4.

The facts admitted in the record before us leads a majority
of the panel of judges considering the case to the following
conclusion:

The Law School Faculty is, at the least, a State funded
committee or group to whom the Board of Governors, President
and Chancellor have in fact, if not by rule, delegated the
authority not only to deliberate on but to conduct the "people's
business" related to the operation of their tax supported Law
School. There are undoubtedly many decisions related to the

operation of the Law School. It seems, however, that few could be of greater interest to those who pay its bills than those relating to the number of lawyers it may train, the entrance and graduation requirements and, therefore, the quality of the students whose, training they subsidize, and the other policy decisions that are, in fact, being made by the Faculty group.

The General Assembly has established the policy that the people's business shall be conducted in public. That policy would be frustrated if the public is admitted only at the highest decision-making level and is excluded at the level where the real deliberation, debate and decision-making process takes place before a subordinate body.

The judgment is affirmed.

Affirmed.

Judge CLARK concurs.

Judge HEDRICK dissents.